UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMES MURRAY,

                              Plaintiff,

        -v.-                                                    9:03-CV-1010
                                                                (DNH/GHL)
R. PALMER, Corrections Officer, Great Meadow C.F.;
S. GRIFFIN, Corrections Officer, Great Meadow C.F.;
M. TERRY, Corrections Officer, Great Meadow C.F.;
F. ENGLESE, Corrections Officer, Great Meadow C.F.;
P. EDWARDS, Sergeant, Great Meadow C.F.;
K. BUMP, Sergeant, Great Meadow C.F.;
K.H. SMITH, Sergeant, Great Meadow C.F.;
A. PAOLANO, Health Director, Great Meadows C.F.;
TED NESMITH, Physicians Assistant, Great Meadows C.F.,

                              Defendants.

_____

R. PALMER, Corrections Officer, Great Meadow C.F.;
S. GRIFFIN, Corrections Officer, Great Meadow C.F.;
M. TERRY, Corrections Officer, Great Meadow C.F.;

                         Counter Claimants,

        -v.-

JAMES MURRAY,

                         Counter Defendant.

_____

APPEARANCES:                              OF COUNSEL:

JAMES MURRAY, 95-A-4417
  Plaintiff, *Pro Se*
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871

HON. ANDREW M. CUOMO                      JAMES SEAMAN, ESQ.
Attorney General for the State of New York     Assistant Attorney General
  Counsel for the Defendants
The Capitol
Albany, NY 12224

GEORGE H. LOWE, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable David N. Hurd, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Currently pending

before the Court is Defendants' motion for summary judgment.  (Dkt. No. 78.)  For the reasons

that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I.    BACKGROUND

### A.    Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine

correctional officials and health care providers employed by the New York State Department of

Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F.")

violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants

Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was

incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but

2

did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist.  (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

###        B.        Defendants' Counterclaim

In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F.  (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.' Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith").  (*See* Caption of Docket Sheet.)  As a result, at the end of this Report-Recommendation, I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002.  (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].)  Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff.  *See Murray v. Westchester County Jail*, 98-CV-0959 (S.D.N.Y.) (settled for $20,000 in 2002).

## II.   DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

### A.   Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (*Id*. at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id*.) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id*.)

4

Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement").  (Dkt. No. 78, Part 12.)  Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence.  (*Id*.)  It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript.  (Dkt. No. 78.)

**B.     Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law  (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to the legal arguments advanced by Defendants.  (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the

lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].)  Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement.  (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].)  Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth . . . specific citation[s] to the record," as required by Local Rule 7.1(a)(3).  (*Id.*)  I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1.  First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits."  N.D.N.Y. L.R. 7.1(a)(3).  In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response.  *See*, *e.g.*, *Vaden v. GAP, Inc.*, 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at *3-5 (M.D. Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia*, 124 F. Supp.2d 1, 4-5 (D.D.C. 2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature).  Moreover,

6

many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of sworn testimony for purposes of a summary judgment motion. *See*, *infra*, notes 10-12 of this Report-Recommendation.

## III.   GOVERNING LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, [1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[2]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[3] The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some

---

[1]      A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[2]      *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

[3]      Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

metaphysical doubt as to the material facts."[4]  Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[5]

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true[6] to the extent that (1) those facts are supported by the evidence in the record,[7] and (2) the non-moving party, if he is proceeding *pro se*, has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[8]

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is

---

[4]        Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading . . . ."); *Matsushita*, 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[5]        *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

[6]        *See* N.D.N.Y. L.R. 7.1(a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.") [emphasis in original].

[7]        *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243 (2d Cir. 2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement.  It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

[8]        *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

proceeding *pro se*.[9]  In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[10]  (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[11]  Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct

---

[9]        *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

[10]        *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.*, 425 F.2d 92, 97 (2d Cir. 1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[11]        *See, e.g.*, *Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places. . . .  It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror

would undertake the suspension of disbelief necessary to credit the allegations made in the

complaint."[12]

## IV.   ANALYSIS

### A.   Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.

1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]).[13]  In order to

---

[12]      *See*, *e.g.*, *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005)
(affirming grant of summary judgment to defendants in part because plaintiff's testimony about
an alleged assault by police officers was "largely unsubstantiated by any other direct evidence"
and was "so replete with inconsistencies and improbabilities that no reasonable juror would
undertake the suspension of disbelief necessary to credit the allegations made in the complaint")
[citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45
(2d Cir. 1986) (affirming grant of summary judgment to defendants in part because plaintiffs'
deposition testimony regarding an alleged defect in a camera product line was, although specific,
"unsupported by documentary or other concrete evidence" and thus "simply not enough to create
a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner*, 03-CV-3789,
2006 WL 357824, at *3-4 & n.7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified
complaint, which recounted specific statements by defendants that they were violating his rights,
was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact
with regard to all but one of prisoner's claims, although verified complaint was sufficient to
create issue of fact with regard to prisoner's claim of retaliation against one defendant because
retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose
testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia
Univ.*, 332 F. Supp.2d 599, 612 (S.D.N.Y. 2004) (plaintiff's deposition testimony was
insufficient evidence to oppose defendants' motion for summary judgment where that testimony
recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence
or benign"), *aff'd*, 136 F. App'x 383 (2d Cir. 2005) (unreported decision, cited not as
precedential authority but merely to show the case's subsequent history, in accordance with
Second Circuit Local Rule § 0.23).

[13]      *Accord*, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*,
434 U.S. 1087 (1978); *Gill v. Mooney*, 824 F2d 192, 196 (2d Cir. 1987).

prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[14]  If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct.[15]  In other words, supervisory officials may not be held liable merely because they held a position of authority.[16]  Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[17]

Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged.  (Dkt. No. 78, Part 13, at 2 [Defs.'

---

[14]     *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

[15]     *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).

[16]     *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

[17]     *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (adding fifth prong); *Wright*, 21 F.3d at 501 (adding fifth prong); *Williams v. Smith*, 781 F.2d 319, 323-324 (2d Cir. 1986) (setting forth four prongs).

Memo. of Law].)  In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i.e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000.  (*Id.*; *see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].)  In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care."  (*Id.*; *see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

### 1.    Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontrovered record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.).  This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement.

(*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].)  Defendants supported this factual

assertion with record evidence.  (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78,

Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not

Defendant Paolano, who treated Plaintiff on 8/17/00].)  Plaintiff has failed to specifically

controvert this factual assertion, despite having been given an adequate opportunity to conduct

discovery, and having been specifically notified of the consequences of failing to properly

respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three*

extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83).  Specifically, Plaintiff

fails to cite any record evidence in support of his denial of Defendants' referenced factual

assertion.  (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].)  As a result, under the Local

Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced

factual assertions.  N.D.N.Y. L.R. 7.1(a)(3).

The Court has no duty to perform an independent review of the record to find proof

disputing this established fact.  *See*, *supra*, Part III and note 9 of this Report-Recommendation.

Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise

its discretion, to perform an independent review of the record to find such proof for several

reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of

discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the

fact that Plaintiff has already been afforded considerable leniency in this action, including

numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully

knowledgeable about the requirements of a non-movant on a summary judgment motion, due to

Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation

experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude.  This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature.  However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[18]  Generally, the rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience*, the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[19]  The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[20]  Similarly, I decide to do so, here, and I recommend the Court do the same.

Plaintiff is no stranger to the court system.  A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15

---

[18]     *Koehl v. Greene*, 06-CV-0478, 2007 WL 2846905, at *3 & n.17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

[19]     *Koehl*, 2007 WL 2846905, at *3 & n.18 [citations omitted].

[20]      *See, e.g.*, *Johnson v. Eggersdorf*, 8 F. App'x 140, 143 (2d Cir. 2001) (unpublished opinion), *aff'g*, 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting*, Report-Recommendation, at 1, n.1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson*, 201 F.3d 431, at *2 (2d Cir. 1999) (unpublished opinion), *aff'g*, 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting*, Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir. 1994); *see also Raitport v. Chem. Bank*, 74 F.R.D. 128, 133 (S.D.N.Y. 1977) [citing *Ackert v. Bryan*, No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

other federal district court actions,[21] and at least three federal court appeals.[22]  Furthermore, a

review of the New York State Unified Court System's website reveals that he has filed at least 20

state court actions,[23] and at least two state court appeals.[24]  Among these many actions he has had

at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[25]

---

[21]       *See Murray v. New York*, 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail*, 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis*, 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis*, 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis*, 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs*, 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey*, 04-CV-0805 (N.D.N.Y.); *Murray v. Goord*, 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman*, 05-CV-1186 (N.D.N.Y.); *Murray v. Goord*, 05-CV-1579 (N.D.N.Y.); *Murray v. Doe*, 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron*, 06-CV-0793 (W.D.N.Y.); *Murray v. Goord*, 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher*, 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow*, 07-CV-0353 (W.D.N.Y.).

[22]       *See Murray v. McGinnis*, No. 01-2533 (2d Cir.); *Murray v. McGinnis*, No. 01-2536 (2d Cir.); *Murray v. McGinnis*, No. 01-2632 (2d Cir.).

[23]       *See Murray v. Goord*, Index No. 011568/1996 (N.Y. Sup. Ct., Westchester County); *Murray v. Goord*, Index No. 002383/1997 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002131/1998 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002307/1998 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002879/1998 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002683/2004 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002044/2006 (N.Y. Sup. Ct., Chemung County); *Murray v. McGinnis*, Index No. 002099/2006 (N.Y. Sup. Ct., Chemung County); *Murray v. Sullivan*, Index No. 002217/2006 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002421/2006 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002495/2006 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002496/2006 (N.Y. Sup. Ct., Chemung County); *Murray v. Goord*, Index No. 002888/2006 (N.Y. Sup. Ct., Chemung County); *Murray v. LeClaire*, Index No. 002008/2007 (N.Y. Sup. Ct., Chemung County); *Murray v. LeClaire*, Index No. 002009/2007 (N.Y. Sup. Ct., Chemung County); *Murray v. LeClaire*, Index No. 002010/2007 (N.Y. Sup. Ct., Chemung County); *Murray v. LeClaire*, Index No. 002011/2007 (N.Y. Sup. Ct., Chemung County); *Murray v. Fisher*, Index No. 002762/2007 (N.Y. Sup. Ct., Chemung County); *Murray v. New York*, Claim No. Claim No. 108304, Motion No. 67679 (N.Y. Ct. Cl.); *Murray v. New York*, Motion No. M-67997 (N.Y. Ct. Cl.).

[24]       *See Murray v. Goord*, No. 84875, 709 N.Y.S.2d 662 (N.Y.S. App. Div., 3d Dept. 2000); *Murray v. Goord*, No. 83252, 694 N.Y.S.2d 797 (N.Y.S. App. Div., 3d Dept. 1999).

[25]       *See Murray v. Westchester County Jail*, 98-CV-0959 (S.D.N.Y.) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact.  (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].)  It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[26]  However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director.  It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)[27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that

---

[26]     To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court.  I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

[27]     *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed. R. Civ. P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord*, *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly*] is . . . requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.") [emphasis in original].

deliberate indifference through a report or appeal.  Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred.  Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference.  Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

> **2.      Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was

personally involved in the creation or implementation of DOCS' prescription-review policy.  It is

an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily

deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that

medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was

made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant

to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not

have the authority to alter that policy.  These were the facts asserted by Defendants in Paragraphs

6 through 9 of their Rule 7.1 Statement.  (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1

Statement].)  Defendants supported these factual assertions with record evidence.  (*Id*. [providing

accurate record citations].)  Plaintiff expressly admits two of these factual assertions, and fails to

support his denial of the remaining factual assertions with citations to record evidence that

actually controverts the facts asserted.  (Dkt. No. 85, Part 2, at 46-47 [Ex. N to Plf.'s Affid.].)

For example, in support of his denial of Defendants' factual assertion that "[t]his policy is

not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an

unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled

by prescriptions from Southport Correctional Facility . . . .  Also I've been transferred to other

prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders."  (*Id*.)  I will

set aside the fact that Defendants' factual assertion is not that the policy applies to every single

DOCS facility but that it applies to them as a general matter.  I will also set aside the fact that

Plaintiff's assertion is not supported by a citation to independent record evidence.  The main

problem with this assertion is that it is not specific as to what year or years he had these

experiences, nor does it even say that his prescriptions were immediately honored without a

review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*)  The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].)  For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion.  The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true.  N.D.N.Y. L.R. 7.1(a)(3).  Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is

even unconstitutional.  I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is . . . shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining . . . ."  (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].)  As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action.  More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion.  (*Id*.)  Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment.  (*Id*.)

If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it.  (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B.      Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id*. at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id*. at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id*. at 11-12.)

21

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries.  These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement.  (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence.  (*Id.* [providing accurate record citations].)  Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted.  (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray.  This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[28]  (Indeed,

_____

[28]       Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning."  (*Id.*)  I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number.  (*See generally* Dkt. No. 78.)  However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers.  (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith Affid.].)  The problem is that document does not say what Plaintiff says.  Rather, it says, "Later that evening [on August 17, 2000] . . . [a]n x-ray was ordered for the following morning . . . ."  (*Id.*)  In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning.  Granted, the second document to which Plaintiff refers, the "Interdepartmental

22

whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning

of August 18, 2000, would appear to be immaterial for the additional reason that it would appear

unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

Moreover, in confirming the accuracy of Defendants' record citations contained in their

Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant

Nesmith's medical care to Plaintiff was both prompt and responsive.  In particular, the record

evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone

in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined

Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was

Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded

to this complaint by confirming that Plaintiff could still move his lower extremities, causing

Plaintiff to receive an x-ray examination of his spine (which films did not indicate any

pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four

sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care

provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at

---

Communication" from Defendant Nesmith, does say that "I saw him the next morning and
ordered an xray . . . ."  (*Id*. at 29.)  I believe that this is a misstatement, given the overwhelming
record evidence to the contrary.

any point in time other than between 4:00 p.m. and midnight on August 17, 2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

(8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead.  (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Affid. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence,"[29]

---

[29]     *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in

one that is "equivalent to criminal recklessness."[30]  There is no evidence of such criminal

recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the

Court, which show a rather prompt and responsive level of medical care given by Defendant

Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

In his argument that his treatment in question constituted deliberate indifference to a

serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have

elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist.  He

argues that this 24-hour period of time constituted a delay that was unreasonable and reckless.  In

support of his argument, he cites two cases.  *See Brown v. Hughes*, 894 F.2d 1533, 1538-39 (11th

Cir.), *cert. denied*, 110 S.Ct. 2624 (1990); *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978),

---

diagnosing or treating a medical condition does not state a valid claim of medical mistreatment
under the Eighth Amendment.  Medical malpractice does not become a constitutional violation
merely because the victim is a prisoner."); *Murphy v. Grabo*, 94-CV-1684, 1998 WL 166840, at
*4 (N.D.N.Y. Apr. 9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison]
medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical
staff, requires more than negligence.  .  .  .  Disagreement with prescribed treatment does not rise
to the level of a constitutional claim. . . .  Additionally, negligence by physicians, even
amounting to malpractice, does not become a constitutional violation merely because the plaintiff
is an inmate. . . .  Thus, claims of malpractice or disagreement with treatment are not actionable
under section 1983.") [citations omitted].").

[30]     *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) ("The required state of
mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal
recklessness, is that the official knows of and disregards an excessive risk to inmate health or
safety; the official must both be aware of facts from which the inference could be drawn that a
substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation
marks and citations omitted]; *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("The
subjective element requires a state of mind that is the equivalent of criminal recklessness . . . .")
[citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal
law is a familiar and workable standard that is consistent with the Cruel and Unusual
Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate
indifference' under the Eighth Amendment.").

*cert. denied*, 446 U.S. 928 (1980).  However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes*, the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer.  *Brown*, 894 F.2d at 1538-39.  However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did."  *Id*.  Those are *not* the facts of this case.

In *Loe v. Armistead*, the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) because the prisoner had alleged that the defendants--*despite being (at some point) "notified" of the prisoner's injured arm*--had inexplicably delayed for 22 hours in giving him medical treatment for the injury.  *Loe*, 582 F.2d at 1296.  More specifically, the court expressly construed the prisoner's complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain.  *Id*. at 1292.  Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the

26

prisoner] repeatedly requested that he be taken to the hospital.  He was repeatedly told that only

the marshals could take him to a hospital and that they had been notified of his injury."  *Id*. at

1292-93.  Again, those are *not* the facts of this case.

Specifically, there is no evidence in the record of which I am aware that at any time

before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a

complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical

symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of

such an injury.  As previously stated, I decline, and I urge the Court to decline, to tediously sift

through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of

evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant

Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this

issue.  That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his

Supplemental Affidavit.  (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets

of Paragraphs numbed "5" through "11"].)  In those Paragraphs, Plaintiff swears, in pertinent

part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill

Redmond RN . . . that my wrist felt broken, and was ignored."  (*Id*. at ¶ 9.)  Plaintiff also swears

that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith,

PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but

wasn't given it [sic]."  (*Id*. at ¶ 10.)  Finally, Plaintiff swears as follows: "At one point on 8/17/00

defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt

broken and how I'm going to sue him cause I'm not stupid [enough] to not know he's supposed to

27

do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain.  He told me [to] stop complaining [and that] he's done with me for the day."  (*Id*. at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff.  It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities.  (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[31]  Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17, 2000), and Defendant Nesmith heard that complaint, and that

---

[31]     In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself.  *See Brown*, 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly.  Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray–or additional diagnostic techniques or forms of treatment–is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice. . . . ."  *Estelle*, 429 U.S. at 107.[32]  For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law.  *Miles v. County of Broome*, 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *27-28 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

---

[32]      *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F. Supp.2d 303, 312 (S.D.N.Y. 2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim.  These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons*, 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at *24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's diagnosis and treatment does not state a constitutional claim.").

> It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[] understandably seeks . . . . We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution. . . . The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves . . . .

*Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

### C.   Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"[33]  In determining whether a particular right was *clearly established*, courts in this Circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.[34]

---

[33]      *Williams*, 781 F.2d at 322 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 [1982]).

[34]      *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly

established right, this "objective reasonableness"[35] test is met if "officers of reasonable

competence could disagree on [the legality of defendant's actions]."[36]  As the Supreme Court

explained,

> [T]he qualified immunity defense . . . provides ample protection to all
> but the plainly incompetent or those who knowingly violate the law.
> . . . Defendants will not be immune if, on an objective basis, it is
> obvious that no reasonably competent officer would have concluded
> that a warrant should issue; but if officers of reasonable competence
> could disagree on this issue, immunity should be recognized.[37]

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective

reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[38]

Here, I agree with Defendants that, based on the current record, it was not clearly

established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth

Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did.

(Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)  I note that neither of the two decisions

---

[35]     *See Anderson v. Creighton*, 107 S.Ct. 3034, 3038 (1987) ("[W]hether an official
protected by qualified immunity may be held personally liable for an allegedly unlawful official
action generally turns on the 'objective reasonableness of the action.'") (quoting *Harlow*, 457
U.S. at 819); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects
defendants "even where the rights were clearly established, if it was objectively reasonable for
defendants to believe that their acts did not violate those rights").

[36]     *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional
Officer Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995) (citing cases); *Ramirez v. Holmes*, 921 F.
Supp. 204, 211 (S.D.N.Y. 1996).

[37]     *Malley*, 475 U.S. at 341.

[38]     *Malsh*, 901 F. Supp. at 764 (citing *Cartier v. Lussier*, 955 F.2d 841, 844 [2d Cir.
1992] [citing Supreme Court cases].)

cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the

Second Circuit.  *See Brown v. Hughes*, 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied*, 110

S.Ct. 2624 (1990); *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978), *cert. denied*, 446 U.S.

928 (1980).  I also note that what was controlling was the Supreme Court's decision in *Estelle v.*

*Gamble*, holding that "the question of whether an X-ray–or additional diagnostic techniques or

forms of treatment–is indicated is a classic example of a matter for medical judgment.  A medical

decision not to order an X-ray, or like measures, does not represent cruel and unusual

punishment.  At most it is medical malpractice. . . . ."  *Estelle*, 429 U.S. at 107.

      Furthermore, I agree with Defendants that, at the very least, officers of reasonable

competence could have believed that Defendant Nesmith's actions in conducting the x-ray

examination and casting when he did were legal.[39]  In his memorandum of law, Plaintiff argues

that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the

four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury* to his

wrist.  (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].)  He cites no portion of the record for

either assertion.  (*Id*.)  Nor would the fact of permanent injury even be enough to propel

Plaintiff's Eighth Amendment claim to a jury.[40]  I emphasize that it is an undisputed fact, for

purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a

---

[39]      (*Id*.)

[40]      This particular point of law was recognized in one of the cases Plaintiff himself
cites.  *Loe*, 582 F.2d at 1296, n.3 ("[Plaintiff's] assertion that he suffered pain two and one-half
weeks after the injury and that the fracture had not healed do not establish deliberate indifference
or lack of due process.  Similarly, his allegation that he has not achieved a satisfactory recovery
suggests nothing more than possible medical malpractice.  It does not assert a constitutional
tort.").

cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[41]  Officers of reasonable competence could have believed that decision was legal.

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

### D.    Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under §1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[42]  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[43]  The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[44]

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following

---

[41]    (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith])

[42]    42 U.S.C. § 1997e.

[43]    *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

[44]    7 N.Y.C.R.R. § 701.7.

33

procedure.[45]  First, an inmate must file a complaint with the facility's IGP clerk within fourteen

(14) calendar days of the alleged occurrence.  A representative of the facility's inmate grievance

resolution committee ("IGRC") has seven working days from receipt of the grievance to

informally resolve the issue.  If there is no such informal resolution, then the full IGRC conducts

a hearing within seven (7) working days of receipt of the grievance, and issues a written decision

within two (2) working days of the conclusion of the hearing.  Second, a grievant may appeal the

IGRC decision to the facility's superintendent within four (4) working days of receipt of the

IGRC's written decision.  The superintendent is to issue a written decision within ten (10)

working days of receipt of the grievant's appeal.  Third, a grievant may appeal to the central

office review committee ("CORC") within four (4) working days of receipt of the

superintendent's written decision.  CORC is to render a written decision within twenty (20)

working days of receipt of the appeal.  It is important to emphasize that any failure by the IGRC

or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be

appealed to the next level, including CORC, to complete the grievance process.[46]

---

[45]     7 N.Y.C.R.R. § 701.7; see also White v. The State of New York, 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

[46]     7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); Hemphill v. New York, 198 F. Supp.2d 546, 549 (S.D.N.Y. 2002), vacated and remanded on other grounds, 380 F.3d 680 (2d Cir. 2004); see, e.g., Croswell v. McCoy, 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); Reyes v. Punzal, 206 F. Supp.2d 431, 433 (W.D.N.Y. 2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); Nimmons v. Silver, 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), adopted by

34

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies.[47]  However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[48]  First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[49]  Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[50]  Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[51]

Defendants argue that Plaintiff never exhausted his available administrative remedies

_____

Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

[47]    *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 347-48 (S.D.N.Y. 2002); *Reyes v. Punzal*, 206 F. Supp. 2d 431, 433 (W.D.N.Y. 2002).

[48]    *See Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).

[49]    *Hemphill*, 380 F.3d at 686 (citation omitted).

[50]    *Id.* [citations omitted].

[51]    *Id*. [citations and internal quotations omitted].

35

with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments.  First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA  (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].)  Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id*. at 25-29.)  In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff.  (*Id*. at 29.)  Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement.  (*Id*. at 30-38.)  Fourth, he argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash[ing]" Plaintiff's grievances and appeals.  (*Id*. at 39-45.)[52]

For the reasons set forth below, I reject each of these arguments.  However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as

---

[52]     I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

a matter of law, based on the current record.

### 1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].)  If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"--from a metaphysical standpoint.  However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists).  *See*, *supra*, note 46 of this Report-Recommendation.

### 2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86, at 25-29 [Plf.'s Memo. of Law].)  This argument also fails.

Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment.  Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been

appropriately characterized as "modest"),[53] the burden then shifts to the nonmoving party to come

forward with specific facts showing that there is a genuine issue for trial regarding exhaustion.

*See*, *supra*, Part III of this Report-Recommendation.

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance

records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that

he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records

maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any

grievance alleging that he had been so assaulted.  (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule

7.1 Statement, providing accurate record citations].)  Plaintiff has failed to properly controvert

these factual assertions with specific citations to record evidence that actually creates a genuine

issue of fact.  (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].)  As a result, under the

Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced

factual assertions.  N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically

meaningless because Great Meadow C.F. did not (during the time in question) have a grievance

"receipt system," that argument also fails.  In support of this argument, Plaintiff cites unspecified

record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great

Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003,

---

[53]        *See Ciaprazi v. Goord*, 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22,
2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for
summary judgment as "modest") [citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324
(1986)]; *accord*, *Saunders v. Ricks*, 03-CV-0598, 2006 WL 3051792, at *9 & n.60 (N.D.N.Y.
Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods*, 03-
CV-0480, 2006 WL 1133247, at *17 & n.109 (N.D.N.Y. Apr. 24, 2006) (Hurd, J., adopting
Report-Recommendation of Lowe, M.J.).

she later claimed that she had never received a letter from Plaintiff.  (*Id*. at 29.)  (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].)  After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question.  (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system."  At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C.F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff.  (*Id*.)  The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances*.  Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or May of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which, when a prisoner (and specifically Plaintiff) filed a

grievance, it was "assign[ed] a number, title and code" and "log[ged] . . . into facility records."
(Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.]
Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a
functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never
being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See*,
*supra*, note 46 of this Report-Recommendation.

### 3.   Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied
the PLRA's exhaustion requirement.  (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].)  This
argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this
determination is located.  (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and
exhibits"].)  Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise
Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so
(and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this
Report-Recommendation.  I have, however, in analyzing the various issues presented by
Defendants' motion, reviewed what I believe to be the material portions of the documents to
which Plaintiff refers.  I report that Plaintiff appears to be referring to a determination by the
Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your
June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is

unacceptable.  It does not present appropriate mitigating circumstances for an untimely filing."
(Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s
Affid.].)

There are two problems for Plaintiff with this document.  First, this document does *not*
constitute a written determination by *CORC* on a written appeal by Plaintiff to *CORC* from an
Upstate C.F. written determination.  (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].)  This
fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen
advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20,
2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from
Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee
(CORC).  The IGP Supervisor did review the matter with Central Office staff who is [sic] not a
member of CORC."  (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].)  At best, the
document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to
CORC would be unlikely.

Second, even if the document does somehow constitute a written determination by CORC
on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by
Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000,
at Great Meadow C.F.  (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].)  Specifically,
Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an
admittedly *untimely* grievance regarding the injuries he sustained during the assault on August
17, 2000.  (*Id*.)

A prisoner has not exhausted his administrative remedies with CORC when, years after

41

failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file

an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of

"mitigating circumstances." *See Burns v. Zwillinger*, 02-CV-5802, 2005 U.S. Dist. LEXIS 1912,

at *11 (S.D.N.Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for

his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to

dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is

granted."); *Soto v. Belcher*, 339 F. Supp.2d 592, 595 (S.D.N.Y. 2004) ("Without mitigating

circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as

untimely constitutes failure to exhaust available administrative remedies.") [collecting cases].  If

the rule were to the contrary, then, as a practical matter, no prisoner could ever be said to have

failed to exhaust his administrative remedies because, immediately before filing suit in federal

court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and

whatever the answer, he could claim to have completed the exhaustion requirement.  The very

reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes

that the permitted appeal would be required to complete the exhaustion requirement.  Viewed

from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not

involve a review of the merits of the appeal.

### 4.    Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable"

to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry,

by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2)

42

failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash[ing]" Plaintiff's grievances and appeals.  (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].)  This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[] the entire transcripts of Defendants['] deposition on [sic] Plaintiff . . . ."  (*Id*. at 40, 45.)  Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation.  I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions*, have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

For example, Plaintiff has adduced no evidence that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[54] nor has he even adduced evidence that it was *one of the named Defendants in this*

---

[54]    (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner.  It's [the] only reason they wouldn't have them. . . .  Prison officials have a history of trashing grievances and appeals. . . .  I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities. . . .  Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old

*action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great

Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and

September 27, 2000.[55]  Similarly, the legal case cited by Plaintiff appears to have nothing to do

with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[56]

### 5.    Record Evidence Creating Genuine Issue of Fact

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of

fact regarding exhaustion, I have, while deciding the many issues presented by Defendants'

motion, had occasion to review in detail many portions of the record.  In so doing, I have

discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave

a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never

received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an

_____

problem . . . ."].)

[55]      (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th,
2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great
Meadow Correctional Facility an envelope addressed to the inmate grievance clerk . . . which
contained the grievances relative to this action at hand . . . ."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s
Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the]
Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and
handing it to [the] correction officer collecting the mail, in F-Block SHU [at] Great Meadow CF
. . . ."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I
appealed said grievance . . . to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the]
inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block
SHU [at] Great Meadow CF . . . ."].)

[56]      (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2,
at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a
prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at
*Sing Sing Correctional Facility*].)

appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[57]

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid.].)

---

[57]    (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand . . . ."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF. . . ."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance . . . to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF . . . ."].)

[58]    *See*, *supra*, note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

### E.    Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility.  (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].)  As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint.  (*Id*.)  In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional.  (*Id*.)

46

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminently [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint.  Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care.  And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended."  (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].)  In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director.  (*Id.* at 10.)

I agree with Defendants that this claim is not properly before this Court.  Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually).  It has long been recognized that a "claim," under Fed. R. Civ. P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts."[59]  Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F.  Indeed, his Second Amended Complaint– which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000–says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy."  (*See generally* Dkt. No. 10

---

[59]     *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.*, 133 F.2d 187, 189 (2d Cir. 1943); *United States v. Iroquois Apartments, Inc.*, 21 F.R.D. 151, 153 (E.D.N.Y. 1957); *Birnbaum v. Birrell*, 9 F.R.D. 72, 74 (S.D.N.Y. 1948).

[Second Am. Compl.].)

Furthermore, under the notice-pleading standard set forth by Fed. R. Civ. P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims.[60]  The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits.[61]  A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[62]  This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close.  (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo. Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

---

[60]     *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (2005) (the statement required by Fed. R. Civ. P. 8[a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

[61]     *Ruffolo v. Oppenheimer & Co., Inc.*, 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb. 5, 1991); *Howard v. Koch*, 575 F. Supp. 1299, 1304 (E.D.N.Y. 1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.*, 20 F.R.D. 579, 582 (S.D.N.Y. 1957).

[62]     *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996) (McAvoy, J.), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) (unpublished table opinion).  Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history.  *See, e.g.*, *Photopaint Tech., LLC v. Smartlens Corp.*, 335 F.3d 152, 156 (2d Cir. 2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.*, 104 F.3d 355 [2d Cir. 1996]).

48

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed. R. Civ. P. 8 is applied with even greater force where the plaintiff is proceeding *pro se*. In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See*, *supra*, notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended.")[63]

_____

[63]      *Stinson v. Sheriff's Dep't of Sullivan Cty.*, 499 F. Supp. 259, 262 & n.9 (S.D.N.Y. 1980); *accord*, *Standley v. Dennison*, 05-CV-1033, 2007 WL 2406909, at *6, n.27 (N.D.N.Y. Aug. 21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord*, 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F. Supp.2d 305, 307 (W.D.N.Y. 2007); *Cosby v. City of White Plains*, 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb. 9, 2007); *Lopez v. Wright*, 05-CV-1568, 2007 WL 388919, at *3, n.11 (N.D.N.Y. Jan. 31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord*, 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary judgment.  Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading).  However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[64]

Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation.  Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional.  *See*, *supra*, Part IV.A.2. of this Report-Recommendation.

---

report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.*, 04-CV-1262, 2007 WL 119453, at *2, n.13 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons*, 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan. 4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

[64]     *See Auguste v. Dept. of Corr.*, 424 F. Supp.2d 363, 368 (D. Conn. 2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**ACCORDINGLY**, it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and

Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese,

Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is

further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be

**GRANTED in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's

claims against Defendants Paolano and Nesmith) and **DENIED in part** (i.e., to the extent that it

requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of

Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days

within which to file written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d

Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 [2d Cir. 1989]); 28

U.S.C. § 636(b); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: February 11, 2008
          Syracuse, New York

George H. Lowe
United States Magistrate Judge

51